[No. 20926-8-II.    Division Two.    January 23, 1998.]

Longview Fibre Company, *Respondent*, v. The
Department of Ecology, *Appellant*.

*Christine O. Gregoire, Attorney General*, and *Mary Sue Wilson* and *Maia D. Bellon, Assistants*, for appellant.

*William L. Dowell*; and *W. Jeffrey Davis, Assistant General Counsel*, for respondent.

SEINFELD, J. — The Department of Ecology fined Longview Fibre Company $5,000 for failing to maintain pollution control equipment at its kraft pulp mill in a manner consistent with "good air pollution control practice." WAC 173-405-040(10). The superior court held that this regulation was unconstitutionally vague and reversed the Pollution Control Hearings Board's ruling upholding the penalty. Finding that the regulation is not void for vagueness, we reverse the trial court.

FACTS

I. The Scrubbers

Longview Fibre uses power boilers at its kraft pulp mill. The boilers produce gas emissions containing particulate matter. A device called a scrubber helps control air pollution by separating the particulate matter from the exhaust gases. After being sprayed with water, the gases are funneled through a narrow U-turn. The gas stream passes over a pool of water at the base of the turn, and the water captures the dampened particulate matter. The cleansed or "scrubbed" gases proceed up the vent and exit directly to the ambient air.

The manufacturer of Longview Fibre's scrubbers fitted each of them with an "overflow/weir box assembly" to regulate the tank water level. The manufacturer's operation and maintenance manual explains that the water level in the scrubber must be "maintained at the required level with an overflow weir." The manual also contains mechanical drawings illustrating the recommended water level. When water is maintained at the recommended level, wa-

ter flows out of the overflow box and empties into an open drain.

## II. The Inspection

The Department of Ecology (DOE) conducted its annual air pollution inspection of the Longview Fibre mill on June 22, 1994. Inspectors Mike Hoyles and Marc Heffner observed numerous large holes ranging in size from two to six inches in the No. 2 and No. 4 scrubber tanks of the No. 20 hog fuel boiler. To limit the escape of water through the holes, Longview Fibre had lowered the water level. Nonetheless, the holes emitted steam and spray into the air, and large quantities of mud collected on the walkways directly below the holes. Hoyles and Heffner also observed that the two damaged scrubbers did not have water flowing from their overflow boxes.

In the past, Longview Fibre had regularly patched holes in the scrubber tanks as soon as they appeared. But after May 18, Longview Fibre ceased its patch work because it had plans to rebuild the damaged scrubber tanks later that summer.

Based on these facts, DOE fined Longview Fibre $5,000 for failing to operate and maintain its "air pollution control equipment[] in a manner consistent with good air pollution control practice." WAC 173-405-040(10). Longview Fibre appealed the fine to the Pollution Control Hearings Board.

## III. The Board Hearing

At the Board hearing, Hoyles and Heffner described the large holes in the scrubber and the accumulations of mud on the walkway around the scrubbers. Heffner explained that the mud was a "primary concern" because it was collecting outside the berm that was designed to capture the mix of water and particulate matter that was periodically emptied from the scrubbers.

He also submitted photographs, taken two days after the

initial inspection, showing the defects in scrubbers Nos. 2 and 4, along with other photographs of scrubber No. 1, which did not have holes. Unlike Nos. 2 and 4, the No. 1 scrubber tank was not emitting steam and spray and did not have a large accumulation of mud at its base.

Hoyles, a sanitary and civil engineer, was DOE's lead inspector at the Longview Fibre plant. He provided expert testimony about scrubber technology and presented diagrams demonstrating the importance of maintaining the scrubbers' water level at the manufacturer's specifications. He explained that when the water in the scrubber dropped below a certain minimum level, a smaller portion of the gas stream contacted the water pool, allowing more of the particulate laden gas to escape unscrubbed. Based on his review of the scrubbers' operation manual, his personal observations of the scrubbers, and his engineering background, Hoyles opined that continuing to operate scrubbers in their damaged condition did not constitute a "good air-pollution control practice."

Lewis Jay Gregory, the utility supervisor at the plant, testified for Longview Fibre. He explained that particulate matter in the hot exhaust gases wore holes in the scrubbers and that this had been a recurring problem. In the past, his staff would patch the holes as they appeared. This time, however, the plant managers decided not to repair the holes because of the scheduled replacement of the scrubber units. Therefore, he testified, "the work required to effect those repairs was not deemed to be practical at the time," given the "limited resources" available.

Gregory acknowledged that gas came out of the holes after the water level was lowered. Nonetheless, he opined that the water levels had a "minimum amount" of impact on the removal of particulate from the gases.

Steven DuVall, Longview Fibre's plant engineer in charge of air quality control, also testified. He acknowledged that Hoyles had sent Longview Fibre a memorandum expressing concern about the low water levels in the scrubbers in the late summer of 1993. But DuVall said that he did not

agree with Hoyles's assessment and chose not to take any corrective actions. He did not share this decision with DOE.

The Board found that the lower water level negatively affected scrubber function, increasing the risk of particulate emission into the air. It also found that during the time at issue, an unspecified amount of particulates escaped capture in the pool and were emitted through the holes. Concluding that Longview Fibre, by failing to repair the "unusually large holes," breached its responsibility to operate its pollution control equipment in a manner consistent with good air pollution control practice and violated WAC 173-405-040(10), the Board upheld the penalty.

Longview Fibre appealed to superior court, claiming, among other things, that the WAC requiring it to operate and maintain the scrubber system "in a manner consistent with good air pollution control practices" was unconstitutionally vague. The superior court agreed and reversed the Board's ruling.

DOE appeals, claiming that WAC 173-405-040(10) is "necessarily general" because it must apply to a variety of facilities, each with its own "unique processes and equipment." It further asserts that Longview Fibre's alternative theories lack merit. Longview Fibre, in addition to claiming that the WAC is unconstitutional because it does not provide sufficient notice of proscribed activities, contends that the Board's findings of fact and conclusions of law are flawed and that the Board made several procedural and evidentiary mistakes during the hearing.

## DISCUSSION

### WAC 173-405-040(10)

We review de novo the trial court's holding that WAC 173-405-040(10) is unconstitutionally vague. *City of Kennewick v. Benton County*, 131 Wn.2d 768, 771, 935 P.2d 606 (1997). A duly adopted regulation is presumed constitutional. Therefore, the party raising a vagueness challenge bears the heavy burden of proving the regulation's uncon-

stitutionality beyond a reasonable doubt. *City of Spokane v. Douglass*, 115 Wn.2d 171, 179, 795 P.2d 693 (1990). As constitutional issues are outside the realm of agency expertise, we do not defer to the agency's application of constitutional principles. *Crescent Convalescent Ctr. v. Department of Soc. & Health Servs.*, 87 Wn. App. 353, 357, 942 P.2d 981 (1997).

A regulation is unconstitutionally vague if persons of common intelligence must necessarily guess at its meaning and disagree as to its application. *Keene v. Board of Accountancy*, 77 Wn. App. 849, 854, 894 P.2d 582 (1995). A statute or regulation, however, does not have to satisfy impossible standards of specificity. *Blondheim v. State*, 84 Wn.2d 874, 878, 529 P.2d 1096 (1975). Therefore, a regulation need not provide a person with the ability to predict with "complete certainty" whether it proscribes a particular course of conduct. *Keene*, 77 Wn. App. at 854. Nor does the use of a vague term within a regulation necessarily render a regulation as a whole impermissibly vague. *Keene*, 77 Wn. App. at 854. Unless the challenge involves First Amendment concerns, the determination of whether a regulation or statute is void for vagueness is made on an as-applied basis. *City of Seattle v. Montana*, 129 Wn.2d 583, 919 P.2d 1218 (1996).

RCW 70.94.395 grants DOE authority to adopt and enforce rules to control and/or prevent the emission of air contaminants from specific sources of air contaminants. RCW 70.94.431(1) provides that persons violating provisions of RCW 70.94 and RCW 70.120 or any rules in force under such chapters may incur civil penalties in an amount not to exceed $10,000 per day for each violation.

The policy and purpose underlying the air pollution control regulations for kraft pulp mills is, in part, to "[e]stablish technically feasible and reasonably attainable standards and revise such standards as new information and better technology are developed and become available." WAC 173-405-012(2). To this end, DOE promulgated WAC 173-405-040, which provides in pertinent part:

In addition to the general applicability of chapters 173-400 and 173-490 WAC to all emission sources; no kraft pulp mill shall cause or permit air contaminant emissions in excess of the limits listed below . . . .

. . . .

(10) Operation and maintenance. At all times, including periods of abnormal operation and upset conditions, owners and operators shall, to the extent practicable, maintain and operate any affected facility, including associated air pollution control equipment, in a manner consistent with good air pollution control practice. Determination of whether acceptable operating and maintenance procedures are being used will be based on information available to ecology which may include, but is not limited to, monitoring results, opacity observations, review of operating and maintenance procedures, and inspection of the source.

Neither the Legislature nor DOE regulations define the terms "good air pollution control practices" and "acceptable operating and maintenance procedures." Accordingly, Longview Fibre argues that these terms are unconstitutionally vague because they do not provide sufficient notice of the proscribed activities.

■ WAC 173-405-040(10) is not unconstitutionally vague. Emissions sources and suitable pollution control techniques vary widely, depending on the contaminant source and the pollution control technology employed. To flexibly and effectively accommodate these variations, DOE imposed a general standard, i.e., "good air pollution control practice," and then identified the means by which it would determine whether the operator complied with this standard. *See Gibson v. City of Auburn*, 50 Wn. App. 661, 668, 748 P.2d 673 (1988) (if listing all types of proscribed conduct is not feasible, general prohibition acceptable).

■ A commonsense reading of the subsection as a whole provides sufficient notice of the proscribed conduct and places operators on notice that (1) they must observe "good air pollution control practice" and (2) DOE may determine

whether the operator satisfied this standard by looking to, among other things, (a) the level of emissions released, (b) operation and maintenance procedures set forth in the operator's operations manual,[1] and (c) its inspectors' observations during on-site visits. Based on this list of criteria, Longview Fibre had fair notice that its failure to follow operation and maintenance procedures, in conjunction with its continued operation of damaged air pollution control equipment, could subject it to civil sanctions.

In addition to the language of the subsection itself, DOE provided Longview Fibre with notice of the maintenance and operation requirements when it approved Longview Fibre's Prevention of Significant Deterioration (PSD) application to modernize its facility. The PSD permit contained the following clause:

> 33. Operating and maintenance manuals for all equipment that has the potential to affect emissions to the atmosphere shall be developed and followed. Copies of the manuals shall be available to the department. *Emissions that result from a failure to follow the requirements of the manuals may be considered proof that the equipment was not properly operated and maintained.*

(emphasis added.) WAC 173-400-030(20) defines "emission" as "a release of air contaminants into the ambient air." The same regulation defines "air contaminant" as "dust, fumes, mist, smoke, other particulate matter, vapor, gas, odorous substances, or any combination thereof." WAC 173-400-030(3).

Here, Longview Fibre allowed large holes to develop in two scrubber tanks. To prevent water from exiting through the holes, Longview Fibre lowered the water level below the operation manual's recommendation. As a result, large

---

[1] WAC 173-400-101(4) requires persons operating air contaminant sources to maintain "an operation and maintenance plan for process and control equipment." This regulation provides that "[i]n most instances, a manufacturer's operations manual or an equipment operation schedule may be considered a sufficient operation and maintenance plan." It also requires the operator to review and update the plan annually and make it available to DOE upon request.

amounts of vapor and spray, which otherwise would have been trapped in the water bath or vented up the stack, escaped through the holes. These emissions, by the terms of Longview Fibre's PSD permit, are evidence that Longview Fibre was not properly operating and maintaining the scrubbers.[2]

In its challenge to the regulatory scheme, Longview Fibre first contends that the regulation is self-contradictory because it requires the operator to observe proper maintenance and operating practices at all times, yet specifically states that the source can continue functioning during "abnormal operation and upset conditions." Although the regulations do not define "abnormal operation" or "upset condition," WAC 173-400-107(6) states that emissions resulting from an "upset" will be considered unavoidable provided, among other things, the operator proves that (1) the "event was not caused by poor or inadequate . . . operation, maintenance, or any other reasonably preventable condition;" (2) "[t]he event was not of a recurring pattern indicative of inadequate . . . operation, or maintenance," and (3) "[t]he operator took immediate and appropriate corrective action in a manner consistent with good air pollution control practice for minimizing emissions during the event." As the violation here involved inadequate operation and maintenance, the portion of the subsection dealing with upset or abnormal operation is not applicable.

Longview Fibre further asserts that DOE, through its long history of allowing scrubbers to operate with holes, lulled Longview Fibre into believing that it was satisfying its legal obligations. But the holes that DOE had discovered earlier were substantially smaller than those at issue here, and Longview Fibre had promptly repaired them. Further, an administrative agency's acquiescence at an earlier time

---

[2]Longview claims that there was no evidence that the emissions contained pollutants. Because the definition of "air contaminant" includes "mist" and "vapor" and "any combination thereof" and because the release of emissions carries the risk of releasing pollutants, this argument is not persuasive.

does not estop it from enforcing the law at a later date. *See AK-WA, Inc. v. Dear*, 66 Wn. App. 484, 490, 832 P.2d 877 (1992) (absent express authority, agencies cannot waive requirement of paying prevailing wage rates, or acquiesce to payments below prevailing wage rate).

Finally, Longview Fibre contends that it should not receive a civil penalty because there was no evidence that it violated emissions limits. Emissions violations, however, are only one factor listed in a nonexclusive list of criteria DOE may consider when determining whether an operator is following good air pollution control practice. *See* WAC 173-405-040(10); *cf. Frame Factory, Inc. v. Department of Ecology*, 21 Wn. App. 50, 56, 583 P.2d 660 (1978). The State has a legitimate interest in preventing conditions that create the risk of a pollution violation. It does not have to wait until conditions deteriorate to such a degree that a violation is inevitable. Compliance with emissions limits is relevant but not dispositive.

Thus, we conclude that the trial court erred in finding WAC 173-405-040(10) unconstitutionally vague. We further conclude that the Board did not err in fining Longview Fibre for violating the regulation. We reverse the trial court and remand.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and HUNT, J., concur.